Filed 1/15/25  In re F.G. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| In re F.G., a Person Coming Under the Juvenile Court Law. | C100603 |
| SAN JOAQUIN COUNTY HUMAN SERVICES AGENCY, | (Super. Ct. No. STKJDDP20230000258) |
| Plaintiff and Appellant, | |
| v. | |
| J.G. et al., | |
| Defendants and Respondents. | |

The San Joaquin County Human Services Agency (Agency) appeals from the juvenile court's January 2024 order granting six months of reunification services for J.G. (mother) and F.M. (father), parents of the minor F.G.  According to the Agency, the juvenile court erroneously failed to make the required findings and orders at the dispositional hearing.  In addition, the Agency contends the court abused its discretion in ordering reunification services for mother and father.  The Agency contends the court

erroneously based its disposition ruling on its finding that reasonable services had not been offered to parents.

Mother contends the Agency's appeal is moot, and the Agency responds that we should exercise our discretion to consider the matter. In November 2024, the juvenile court supplemented the record with minute orders filed after the court's January 2024 order. We provided the parties an opportunity to submit supplemental briefing addressing whether the issues raised in this appeal are moot in light of the supplemented record. Neither party responded. We conclude that the matter is not moot and will reverse and remand with directions to enter new disposition orders nunc pro tunc.

FACTUAL AND PROCEDURAL BACKGROUND

A.    *Initial Detention and Section 300 Petition*

In July 2023, the Agency filed a petition alleging that the newborn minor came within the provisions of Welfare and Institutions Code[1] section 300, subdivisions (b)(1), failure to protect and inability to care for the child, and (j), abuse of sibling. The minor was placed in protective custody the day he was born.

The minor's older siblings, F. and R., had been adjudicated to be dependent children on June 30, 2021, and January 18, 2022, respectively (those proceedings are not at issue here). In these prior proceedings, two psychologists had separately opined that mother, who was a regional center client, suffered from an intellectual development disorder, which the Agency argued hampered her ability to safely care for the minor's siblings. One of the psychologists opined mother was unable to benefit from reunification services, while the other opined reunification was not in the child's best interest without "24/7 supportive living services." The juvenile court had found true in these prior proceedings that mother was unable to tell time, hampering her ability to

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

provide regular feedings, and she had difficulty remembering instructions. In addition, hospital staff had noticed mother and father needed help caring for the minor's siblings when they were each born, with the hospital assigning a 24-hour nurse to help mother care for F. Agency staff also previously observed unhealthy living conditions, including insect infestations and pet urine. Father was unable to provide adequate supervision given his work schedule. Mother was not offered services in the cases involving F. and R. based on her intellectual disability. Father was offered services in the case involving F. but not in the case involving R. because he did not engage in the services offered in F.'s case. Parental rights as to both F. and R. were terminated in August 2022.

The petition further alleged mother was unable to care for the minor's needs without "constant supervision." She had to be prompted to feed the minor, and she lacked necessary supplies for the minor, such as a car seat. Similar to F. and R., father was not present to supervise the minor, as he was working out of state when the minor was born.

The day after the minor was born, the juvenile court found a prima facie case had been made and ordered the minor detained. Specifically, the court found there was a "substantial danger to the physical and emotional health of the child, and there [were] no reasonable means by which the child's physical and emotional health [may be] safeguard[ed] without removal." The court also found the initial detention was justified for the same reasons and that "reasonable efforts have been made to prevent or eliminate the need for removal." The court ordered supervised visits for mother but did not address other services.

B.     *Jurisdiction/Disposition Report*

The Agency filed its jurisdiction/disposition report in August 2023. Mother had been regularly attending supervised visits, and she was engaged during the visits and said she wanted to learn to care for the minor. She had started to identify the minor's cues, but she still needed to be prompted regarding basic needs for the minor, including

3

feeding, burping, and diaper changes. Mother insisted she was able to attend to the minor's needs. In addition, the parents were unable to provide appropriate living conditions for the minor. Although mother recognized the Agency's concerns that she was unable to provide safe and stable living conditions for the minor, she had not tried to change her housing. She acknowledged there had been domestic violence with father, who was a seasonal farmworker and was working out of state at the time of the report. The social worker opined the minor could not be safely returned to the home with mother, since her intellectual disability made her unable to provide for the minor's basic needs without constant supervision.

With respect to reasonable efforts made by the Agency to prevent the minor's removal from mother's care, the report noted that the Agency maintained contact with mother and the minor at least once a month. As preliminary services, mother had been referred to parent education with a focus on boundaries, parent-child role reversal, special needs, discipline and corporal punishment, stress and anger management, child development, personal safety, and domestic violence. She had also been referred to individual counseling to address how her intellectual disabilities hinder her ability to care for her children, her prior refusal of regional center services, her history of domestic violence relationships, and any other issues identified by mother and the clinician. However, mother had not yet engaged in parent education or counseling. Father had not been offered preliminary services because he remained only an alleged father.

The Agency recommended no reunification services be provided to mother pursuant to section 361.5, subdivision (b)(10) and (11). Parental rights as to F. and R. had been terminated, and mother had been bypassed for services in those cases pursuant to section 361.5, subdivision (b)(2). The Agency also noted father was not entitled to services because paternity had not yet been established.

The report also included the two psychological evaluations from the prior dependency proceedings. In December 2020, Dr. Baljit Atwal performed a psychological

4

evaluation of mother with respect to the case involving F. Dr. Atwal concluded mother is "significantly delayed intellectually" and met the criteria for moderate intellectual development disorder. This is a "permanent and stationary, life-long condition." She explained that mother would "always have difficulty processing new information, learning new things, and altering her behavior." She would "have difficulty caring independently [and] effectively for her baby," and mother would likely need full-time supervision to do so. Dr. Atwal further noted that, as a child, mother had been removed from the maternal grandmother's care because the maternal grandmother also had an intellectual disability that rendered her unable to safely care for mother.

In June 2021, Dr. Sidney Nelson performed a psychological evaluation of mother with respect to the case involving F. Testing revealed mother had "very serious" intellectual and cognitive ability impairments, "within the moderate range of intellectual disability." Her conceptual thinking and abstract reasoning skills were "poor," and her expressive vocabulary was limited. Her intellectual abilities were "below the lowest 1% of the general adult population," and she was unable to functionally read or tell time. She had "very limited" social judgment and decisionmaking abilities, and she likely needed "much assistance and guidance" with life decisions, including healthcare and legal decisions. Dr. Nelson diagnosed mother as having moderate intellectual disability with a "poor" prognosis for becoming an independent adult. He further opined that mother would not be able to utilize or benefit from reunification services. Even with reunification services, mother would be "incapable of adequately caring for her child within twelve months."

C.    *Interim Hearings and Supplemental Jurisdiction/Disposition Report*

Although the jurisdiction/disposition hearing was originally scheduled for September 27, 2023, the juvenile court continued the matter to October 30, 2023, because mother requested a contested hearing and mother's counsel was unavailable until then. The court further noted that father had missed two paternity tests.

5

On October 30, 2023, after father finally attended the third paternity test, the juvenile court found father was the biological father of the minor and appointed counsel. The court continued the matter to December 19, 2023, to give the Agency time to submit a supplemental report and father's counsel time to prepare. It was not possible to set the date sooner given counsels' schedules. The court ordered supervised visits with the minor for father.

The November 2023 supplemental disposition report noted mother had maintained consistent twice-weekly visitation with the minor. Mother continued to need prompting on how to recognize the minor's needs, including hunger and diaper changes. For example, during a visit on October 24, 2023, mother fed the minor but had to be reminded to burp him. In addition, mother "becomes scared and panicked when [the minor] begins to cry." The monitor also had to remind mother that she did not need to ask permission to change the minor's diaper or provide other basic care. Still, mother was "mostly successful" at interacting and playing with the minor. During another visit on October 26, 2023, the caregiver helped mother soothe the minor.

As to preliminary services, mother had completed parent education in November 2023. Mother had also completed three individual counseling sessions, although she had multiple missed appointments. Mother had also rescheduled some appointments and had shown up to unscheduled appointments. The clinician believed mother was unable to understand her diagnosis. The clinician further opined mother was "still learning" how to parent, and the clinician remained "unsure" as to whether mother could be left alone with the minor, especially since mother had been unable to answer the clinician's questions about feeding the minor. Mother also remained "adamant" that the allegations made in the case were false and insisted her intellectual disabilities did not prevent her from safely caring for the minor.

Meanwhile, father had been referred for parent education with a focus on boundaries, parent/child role reversal and parentification, special needs, discipline and

6

corporal punishment, stress and anger management, child development, personal safety, and domestic violence.  Father had not enrolled in parenting education.  Although he had started having joint visits with the minor and mother at the end of October 2023, he had not started the individual counseling that had been offered by the Agency.  Father remained in denial of mother's intellectual disability and did not understand the safety concerns, meaning he would not benefit from reunification services.  In addition, father lacked a bond with the minor, and he had failed to alleviate the Agency's concern with appropriate living conditions, which had been an issue since the proceedings regarding F. and R.  He had recently started working on home repairs, but he had no explanation as to why it had taken him so long.

The Agency continued to recommend no reunification services for mother pursuant to section 361.5, subdivision (b)(2) and (11), and no services for father pursuant to section 361.5, subdivision (a).  The report referred to the reports from Dr. Atwal and Dr. Nelson, noting mother was not offered reunification services in the cases involving F. and R. pursuant to section 361.5, subdivision (b)(2).  However, father was not offered reunification services in the case involving R. because he was not engaged.  The Agency also recommended the minor remain in out-of-home placement.

D.     *Jurisdiction/Disposition Hearing*

During the contested jurisdiction/disposition hearing held on December 19, 2023, and January 30 and 31, 2024, a caregiver employed by Service First (a vendor for the regional center) testified that she had been assisting mother with parenting and life skills for approximately 11 months.  At the time of the hearing, the caregiver worked with mother for 50 hours per month, although no special training or college education was required for her position.  The caregiver had previously been a medical assistant and had completed two years of college education, though without earning a degree.  The caregiver testified that mother appeared committed to learning the necessary skills and seemed more mature.  Although initially concerned that mother might be unable to care

7

for the minor, the caregiver stated that mother "ha[d] proven that she's ready and that she's willing to take on [parenting] responsibility." Mother had taken good care of the minor while they were in the hospital after his birth, including holding and feeding him. According to the caregiver, mother was "quick to learn" and understood what the caregiver was teaching her. Mother had independently attended parenting education classes on her own and had learned from them. The caregiver also stated that the regional center could provide additional personal assistant hours.

The social worker testified that she observed mother during at least two visits, during which mother required prompting on how to care for the minor, including diaper changes, feeding, soothing, and holding him. Visits had improved since November 30, 2023, and as of August 24, 2023, the visitation monitor had no concerns regarding the visitation plan, noting that mother sometimes correctly held the minor and attended to his needs. However, despite mother telling her therapist that she was no longer scared when the minor cried, the visitation monitor described mother as panicking when he cried. Additionally, mother often asked permission before providing care to the minor. The social worker also observed that mother had no "concept of numbers or money," leading her to believe that mother would be unable to perform certain essential tasks, such as taking the minor to the doctor or administering prescribed medications.

In the social worker's opinion, mother had all the necessary services, including the caregiver through Service First, the Agency-recommended parenting education classes, and the Agency-recommended individual counseling. However, the social worker believed there were no additional services she could provide that would alleviate her concerns about mother's ability to parent the minor. The social worker opined that mother would need 24-hour care to safely care for the minor, though she was unsure how to obtain such assistance. During the December 19, 2023 hearing, the social worker testified that she had not inquired about potential additional services for which mother might be eligible at the regional center. By the January 30, 2024 hearing, however, she

8

had done so and learned that the regional center offered additional services, including a different parenting program ("SPEAK") and a once-a-month program for high-risk infants through age five. Mother had participated in the SPEAK program while pregnant, but had quit at four months due to concerns about interaction with child protective services. The social worker had not offered any additional services to assist mother with her inability to tell time or read.

As to father, he had started counseling after the supplemental jurisdiction/disposition report was written, but, had missed a few sessions. The social worker testified that she had spoken with father about his failure to recognize mother's intellectual disability. Father began participating in visits with the minor and mother at the end of October 2023, when the minor was four months old. During these visits, father acted appropriately and took on "more of a primary [caregiver] role."

On December 19, 2023, the juvenile court ordered separate visits for mother and father. On January 31, 2024, the juvenile court found the petition to be true and took jurisdiction under section 300, subdivisions (b)(1) and (j). The court noted it had heard the witness testimony, read the social worker's reports, and considered all exhibits.

Turning next to disposition, the juvenile court heard extensive argument from counsel. Counsel for the Agency argued that, although the general preference of dependency is to offer reunification services, the Legislature had made it clear that bypassing reunification services is sometimes appropriate. For example, a biological father is not entitled to reunification services, although he may receive services if they will benefit the child. Counsel then argued that father had failed to meet this burden. Even if father were able to establish eligibility as a presumed father, the court should still bypass him pursuant to section 361.5, subdivision (b)(10) and (11), especially given his failure to make reasonable efforts to eliminate the needs that resulted in the prior dependency case and the previous termination of his reunification services. According to

9

counsel, the cases involving the minor and his older siblings were "inarguably identical in their presentation."

Apparently focused on whether the Agency's actions had been reasonable, the juvenile court then asked what efforts the Agency had made to "get the parents engaged in services that would address the issues that brought them to court again." Counsel for the Agency noted that father had been referred for paternity testing, counseling, parenting education, and visitation, but he had been slow to engage with these preliminary services. Counsel reminded the court that the standard of review at disposition was to consider whether "reasonable services were provided to prevent or eliminate the need for removal," not whether reasonable services had been provided in totality.

In apparent frustration with the Agency, the juvenile court responded: "I don't have to allow closing arguments. So, you know, I'm trying to direct you, because I'm not very happy with this case. And I'll be honest with you, from where I sit, it looks like the Agency mailed this in. They used a 2020 [and 2021] doctor's report . . . , which show severe mental health issues for the mother, but [mother's needs were] simple things" such as reading and telling time, and the Agency had failed to offer relevant services. Counsel for the Agency reminded the court that mother had been bypassed in the cases involving the minor's older siblings based on mother's intellectual disability and inability to benefit from services. Still frustrated, the court interrupted counsel for the Agency, stating that she was "done," and asked for argument from the other counsel. The minor's counsel argued that father should be offered services because it was in the minor's best interest. However, counsel expressed uncertainty regarding mother, noting that she suffered from a permanent intellectual disability, though the regional center might offer additional services to assist her. Counsel for both mother and father argued that reasonable services had not been offered. The court then asked counsel for the Agency if she had any rebuttal argument "on reasonable services." Counsel for the Agency responded both parents had been offered reasonable preliminary services, especially since the

10

psychological reports opined mother would not benefit from any services, and father had previously been offered services in the prior dependency cases involving the minor's older siblings.

Noting that the case was not "simple," and it had to consider the minor's "best interest," the juvenile court then turned to considering whether the Agency had offered "reasonable services." The court noted it did not find the social worker very credible. Turning to father, the court found the Agency had not offered reasonable services because the social worker had not referred him to services that would help him realize the impact of mother's intellectual disability, which the court considered to be father's "biggest issue." The court further noted that, if father were "home taking care of [the minor or the minor's siblings], or leaving them with an appropriate adult we wouldn't be here." The court therefore ordered reunification services for father. Turning to mother, the court stated it did not find the psychological reports to be stale. Still, the Agency had not offered reasonable services to mother, because the social worker had done "very little research" regarding other potential services, including failing to research potential additional services from the regional center that could benefit mother. The court therefore ordered reunification services for mother. The court noted that father's counseling should be focused on helping him recognize mother's intellectual disability, and that the Agency should investigate whether full-time care was available from the regional center, and whether mother would participate.

The juvenile court also ordered a psychological evaluation of father, with a focus on his understanding of mother's intellectual disability, and why father was unable to care for the minor or find a responsible adult to care for the minor. The court further ordered a new psychological evaluation of mother, with an emphasis on identifying any additional services that might benefit her, and determining how to tailor those services to her specific needs. The court did not address whether it adjudged the minor to be a dependent of the court or whether removal was appropriate. It ordered that all prior

11

orders not in conflict with the new orders remain in full force and effect. Although the court initially proposed holding a review hearing in six weeks, it ultimately set the next hearing for July 2024 to allow sufficient time for the evaluations to be completed. The court admitted the jurisdiction/disposition report and supplemental report into evidence but declined to adopt the supplemental report. The Agency timely appealed.

During the next hearing on July 31, 2024, the juvenile court gave the Agency the discretion to increase mother's visits. The court also authorized mother to receive an evaluation from a local services program and permitted the Agency to "look into" the program.

The next hearing was on August 7, 2024, when the juvenile court set a contested hearing regarding mother. The following month, the juvenile court continued the matter so father could be present. The court also ordered the Agency to investigate the services recommended in a psychological evaluation and update the court. The court continued the matter on October 2, 2024, and held its next hearing on October 9, 2024. During that hearing, the Agency recommended terminating services for father. The court ordered the Agency to "make all necessary referrals" for mother and father "immediately." The court also ordered supervised visits for father. The court then set the next hearing for December 5, 2024.

## DISCUSSION

### I

As a preliminary matter, we first consider whether the issues raised in this appeal are moot—namely whether (1) the juvenile court erred in failing to make required disposition findings and (2) the juvenile court abused its discretion in ordering reunification services for mother and father. "An appellate court will not review questions which are moot and only of academic importance," such as where no party can show its substantial rights would be affected by a decision either way, or where the

12

reviewing court cannot grant the appellant any effective relief. (*In re Esperanza C.* (2008) 165 Cal.App.4th 1042, 1054.)

Based on the minute orders filed after January 2024, the juvenile court did not make any subsequent dispositional findings nor terminate services for mother or father. As such, the issues raised in this appeal are not moot, and we will turn to the merits.

II

The Agency contends the juvenile court erred in failing to make required disposition findings. We agree.

Once the juvenile court takes jurisdiction in a dependency case, it must decide the appropriate disposition. (*In re Stephen W.* (1990) 221 Cal.App.3d 629, 645; §§ 358, 360, subd. (d), 361, 362.) In addition to considering whether to declare the child to be a dependent of the juvenile court (§ 360, subd. (d)), the court must also consider whether to remove the child from the parents' care and, if removal is warranted, whether to order services to promote reunification. (*In re Stephen W.*, at p. 645; see also § 361.5, subd. (a).) A court may not remove a child without adjudging the child to be a dependent of the court. (See *In re L.W.* (2019) 32 Cal.App.5th 840, 851 [unless the juvenile court determines the case only warrants the agency's supervision of family maintenance, it "must 'adjudicate the child a dependent' " of the court].) In rendering its disposition, a court shall consider the social worker's report and state that it has read the report. (§ 358, subd. (b)(1).)

As relevant here, a court may remove a child from parental care only if it finds by clear and convincing evidence that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor." (§ 361, subd. (c)(1); see also Cal. Rules of Court, rule 5.695(c) [the court may not order a dependent removed unless it makes the findings required under § 361, subd. (c)].) The court must also

13

determine whether "reasonable efforts were made to prevent or to eliminate the need for removal of the minor" and "state the facts on which the decision to remove the minor is based." (§ 361, subd. (e); see also Cal. Rules of Court, rule 5.695(d) [requiring the court to make a finding as to whether reasonable efforts were made to prevent removal].)

For example, in *In re Ashly F.* (2014) 225 Cal.App.4th 803, the department of children and family services (department) removed the children from their home based on allegations that the mother physically abused them and that the father failed to protect them from the mother's abuse. (*Id.* at pp. 806-807.) Both parents cooperated with the department, with the mother removing herself from the family home and the father completing a parenting class. (*Id.* at p. 810.) But the department never described what reasonable means for protecting the children were considered, nor what reasonable efforts were made to prevent the children's removal from their home. (*Id.* at p. 808.) During the jurisdiction/disposition hearing, the juvenile court removed the children but did not state any facts supporting its findings. (*Ibid.*) On appeal, the court reversed the disposition order because the evidence did not support the juvenile court's findings that the department had made reasonable efforts to prevent the children's removal, or that there were no reasonable means to protect the children other than removal. (*Id.* at p. 805.) Instead, the juvenile court should have considered whether the mother's removal from the family home was a reasonable means of protecting the children. (*Id.* at p. 810.)

Here, the juvenile court ordered services for mother and father and directed that all prior non-conflicting orders remain in effect, which, at best, could be interpreted as the court's intent to keep the minor in his out-of-home placement. To the extent the court intended to remove the minor from parental care, it did so without making any of the required supporting findings, including that the minor was a dependent of the court, that the minor would be at risk if not removed, that there were no reasonable means of protecting the minor without removal, and that the Agency had made reasonable efforts to prevent the need for the minor's removal. And, despite asking detailed questions

14

during the social worker's testimony, the juvenile court also failed to state that it had considered the social worker's report in rendering its disposition. (§ 358, subd. (b)(1).)

Moreover, it appears that any decision the juvenile court made regarding placement was based solely on its determination that mother and father had not been offered reasonable reunification services. Although it is appropriate to consider whether reasonable services have been provided when a juvenile court is considering whether to extend reunification services beyond those initially ordered at disposition (see §§ 361.5, subd. (a)(3), 366.21, subd. (e)(3), (8)), this was not the proper test here. It is abuse of discretion for the court to apply the wrong test. (*Paterno v. State of California* (1999) 74 Cal.App.4th 68, 85 (*Paterno*) ["[a] trial court abuses its discretion when it applies the wrong legal standards applicable to the issue at hand"].)

The juvenile court failed to make the findings required to remove the minor, despite having evidence relevant to those findings, particularly it had previously made the same findings during the July 2023 detention hearing when it ordered out-of-home placement for the minor. There was evidence showing that removing the minor from parental custody was necessary to protect his well-being, and there were no other reasonable means of protecting the minor without removal. Unlike the parents in *Ashly F.*, here, mother's permanent intellectual disabilities made her unable to independently care for the minor, who was at high risk given his young age. Meanwhile, father was unable to protect the minor because he failed to recognize mother's limitations and regularly worked out of state.

Unlike in *Ashly F.*, here there was also substantial evidence that the Agency had made reasonable efforts to prevent the need for the minor's removal, including meeting regularly with both parents, offering supervised twice-weekly visits, and providing preliminary parenting classes and individual counseling to both parents. (*In re H.E.* (2008) 169 Cal.App.4th 710, 725 ["reasonable efforts . . . need only be reasonable under the circumstances, not perfect"].) The juvenile court's failure to make the required

disposition findings was error, and we will remand the matter for the court to enter the required findings nunc pro tunc.

III

The Agency next contends the juvenile court erroneously failed to rely on the standards set forth in section 361.5, subdivisions (a) and (b)(2) and therefore abused its discretion in ordering reunification services for mother and father. According to the Agency, the record establishes that mother was ineligible to receive services pursuant to section 361.5, subdivision (b)(2). In addition, the juvenile court erroneously failed to find that ordering services for father (who is only a biological father) would benefit the minor, as required under section 361.5, subdivision (a).

A.     *Legal Background*

Whenever a child younger than three years old is removed from a parent's custody, section 361.5, subdivision (a) requires a juvenile court to order six months of reunification services in most cases. (See *Tonya M. v. Superior Court* (2007) 42 Cal.4th 836, 845 [it is generally presumed at the outset of dependency proceedings that a parent will receive six months of services].) " 'Reunification services implement "the law's strong preference for maintaining the family relationships if at all possible." [Citation.]' [Citation.] Reunification services are typically understood as a benefit provided to parents, because services enable them to demonstrate parental fitness and so regain custody of their dependent children." (*In re Nolan W.* (2009) 45 Cal.4th 1217, 1228.)

A court may extend reunification services up to 18 months from the date the child was removed from the parent's physical custody under certain circumstances, including where reasonable services have not been provided to the parent. (§ 361.5, subd. (a)(3)(A).) Whether the services offered were reasonable and suitable is judged according to the circumstances. (*Earl L. v. Superior Court* (2011) 199 Cal.App.4th 1490, 1501.) Any reunification plan must be tailored to the family's circumstances, and "must

16

be designed to eliminate those conditions which led to the juvenile court's jurisdictional finding." (*In re Dino E.* (1992) 6 Cal.App.4th 1768, 1777.)

Whether a father is eligible for reunification services is based on his status as an alleged, biological, or presumed father. (*In re T.R.* (2005) 132 Cal.App.4th 1202, 1208-1209 ["[a] father's status is significant in dependency cases because it determines the extent to which the father may participate in the proceedings and the rights to which he is entitled"].) A presumed father, or one who has established that he has taken an active familial role in the child's life, has a right to a reunification plan. (*Ibid.*; see also Fam. Code, § 7611 [listing criteria for establishing presumed father status].) In contrast, a biological father is one who has established paternity but has not demonstrated that he qualifies as the child's presumed father. (*In re T.R.*, at p. 1209 ["[a] biological father can be a presumed father, but is not necessarily one"].) A juvenile court has discretion to offer services for a biological father if it finds the services will benefit the child. (§ 361.5, subd. (a).)

Still, the Legislature has made clear that, in certain circumstances, reunification services must not be offered where doing so would not serve or protect the best interests of the child. These narrowly tailored exceptions—also known as bypass provisions—to the general preference for reunification services are set forth in section 361.5, subdivision (b), and must be proven by clear and convincing evidence. (*In re Baby Boy H.* (1998) 63 Cal.App.4th 470, 474.) One such exception is when the juvenile court finds by clear and convincing evidence that the parent is suffering from a mental disability rendering the parent "incapable of utilizing those services." (§ 361.5, subd. (b)(2).) A mentally disabled parent is one who suffers a mental incapacity or disorder that renders the parent "unable to care for and control the [minor] child adequately." (Fam. Code, § 7827, subd. (a); see § 361.5, subd. (b)(2) [incorporating definition by reference].) When it is alleged that this mental disability exception applies, courts must order reunification services "unless competent evidence from mental health professionals establishes that, even with

17

the provision of services, the parent is unlikely to be capable of adequately caring for the child within the time limits specified in subdivision (a)." (§ 361.5, subd. (c)(1).)

Another exception is when a juvenile court has terminated parental rights over a sibling or half sibling to the child in the current case, and that parent "has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling . . . from the parent." (§ 361.5, subd. (b)(11)(A).) Similarly, there is an exception when a juvenile court has terminated reunification services for any sibling or half sibling because the parent failed to reunify with him or her after he or she had been removed pursuant to section 361, and that parent "has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling . . . from that parent." (§ 361.5, subd. (b)(10)(A).) If either of these bypass provisions applies, the juvenile court may order services only if the parent proves that reunification is in the child's best interest. (*In re Jayden M.* (2023) 93 Cal.App.5th 1261, 1272-1273.) The court "may consider a variety of factors relevant to the child's best interest, including (1) the parent's ' " 'current efforts and fitness,' " ' (2) the parent's ' " 'history,' " ' (3) the ' " 'gravity of the problem' " ' that led to the assertion of dependency, (4) the ' "strength of the bonds" ' between the child and the parent and between the child and the current caregiver, and (5) the ' " 'child's need for stability and continuity.' " ' [Citation.] One factor that is essential—and hence necessary—to the assessment of a child's best interest is whether there is ' "some 'reasonable basis to conclude' " ' that reunification is possible; if it is not, offering reunification services that are destined to fail is not in the child's best interest." (*Ibid.*)

Because reunification orders are within the juvenile court's broad discretion to fashion a disposition in the minor's best interest, we review such orders for abuse of discretion. (See *In re Baby Boy H.*, *supra*, 63 Cal.App.4th at p. 474.) A juvenile court is required to make its supporting findings regarding bypass provisions by clear and convincing evidence, but we view the evidence most favorably to the order and uphold

18

the order if substantial evidence supports it.  (See § 361.5, subd. (b); see also *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005.)  "[T]he question before a court reviewing a finding that a fact has been proved by clear and convincing evidence is not whether the appellate court itself regards the evidence as clear and convincing; it is whether a reasonable trier of fact could have regarded the evidence as satisfying this standard of proof."  (*Conservatorship of O.B.*, at p. 1009.)

B.    *It was Abuse of Discretion to Fail to Consider Whether the Section 361.5, Subdivision (b)(2) Bypass Provision Had Been Met*

Here, the juvenile court's duty was to determine whether there was clear and convincing evidence that mother suffered from a mental disability rendering her "incapable of utilizing [reunification] services."  (§ 361.5, subd. (b)(2).)  Such evidence included reports from two psychologists indicating that mother was unable to independently care for a child and would not benefit from services.  The court found that these reports were not stale and had previously relied on them to bypass mother for services for the minor's older siblings based on mother's intellectual disability.  Moreover, mother's current counseling clinician believed mother was unable to understand her diagnosis and was still learning how to parent, especially since mother had been unable to answer the clinician's questions about feeding the minor.

Instead of focusing on whether the section 361.5, subdivision (b)(2) bypass provision had been met, here the juvenile court ordered services for mother because she had not been offered reasonable services.  As previously noted, while it is appropriate to consider whether reasonable services have been provided when a juvenile court is considering whether to extend reunification services beyond those initially ordered at disposition (see §§ 361.5, subd. (a)(3), 366.21, subd. (e)(3), (8)), this is not the test when considering whether to bypass a parent under section 361.5, subdivision (b)(2).  It was an abuse of discretion for the court to apply the wrong test.  (*Paterno*, *supra*, 74 Cal.App.4th

at p. 85 ["[a] trial court abuses its discretion when it applies the wrong legal standards applicable to the issue at hand"].)

Under the circumstances, we will remand the matter for the juvenile court to issue new orders regarding whether section 361.5, subdivision (b)(2) has been established as to mother. Should the court determine that the section 361.5, subdivision (b)(2) bypass provision has not been proven, the court must then consider whether the bypass provisions under section 361.5, subdivision (b)(10) or (11) apply, as argued by the Agency.

C. *It Was Abuse of Discretion to Fail to Determine Whether Father Was Entitled to Services Under Section 361.5, Subdivision (a)*

With respect to father, the juvenile court's duty was to determine whether it should exercise its discretion to order services for him because the services would benefit the minor. (§ 361.5, subd. (a).) This included considering evidence that father continued to be in denial about mother's intellectual disability and her inability to safely care for the minor, despite previously receiving services in the case involving F. and speaking with the social worker in the current case. In addition, father had rescheduled his paternity test twice, had not yet enrolled in parenting classes, and had missed multiple individual counseling sessions. His lack of participation was particularly notable given that he had already been bypassed for services with R. due to failure to engage, and his parental rights had been terminated for both F. and R. In addition, he lacked a bond with the minor.

Instead, similar to mother, the juvenile court focused on whether the Agency had provided reasonable services. Again, this is the test for considering whether to extend reunification services beyond those initially ordered at disposition (see §§ 361.5, subd. (a)(3), 366.21, subd. (e)(3), (8)), not whether a biological father is entitled to services under section 361.5, subdivision (a). It was an abuse of discretion for the court to apply

20

the wrong test.  (*Paterno*, *supra*, 74 Cal.App.4th at p. 85 ["[a] trial court abuses its discretion when it applies the wrong legal standards applicable to the issue at hand"].)

Under the circumstances, we will remand the matter for the juvenile court to issue new orders regarding whether it should exercise its discretion to order reunification services for father under section 361.5, subdivision (a).  Given our findings, we need not address whether the juvenile court also abused its discretion regarding the application of the section 361.5, subdivision (b)(10) or (11) bypass provisions.

DISPOSITION

The juvenile court's orders are reversed.  The juvenile court is directed to enter new disposition orders nunc pro tunc consistent with the views expressed in this opinion, including whether the minor is a dependent of the juvenile court, whether to remove the minor from the parents' care, and, if removal is warranted, whether to order services to promote reunification.

/s/
BOULWARE EURIE, J.

We concur:


/s/
EARL, P. J.



/s/
WISEMAN, J.*

_____

* Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

21